J-A19044-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF B.M.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.F., MOTHER | : | |
| | : | No. 352 MDA 2022 |

Appeal from the Decree Entered January 28, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9166

BEFORE:   BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED: AUGUST 4, 2022**

Appellant, M.F. ("Mother"), files this appeal from the order entered January 28, 2022, in the Luzerne County Court of Common Pleas, granting the petition of the Luzerne County Children and Youth Services ("CYS" or "the agency") to involuntarily terminate Mother's parental rights to her minor, female child, B.M.F., born in August 2019 ("Child"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(5), (8), and (b).[1]  After careful review, we affirm.

Shortly after Child's birth in August 2019, hospital staff contacted CYS with concerns that Mother had significant difficulties caring for Child's basic needs (e.g. changing her diaper and feeding her).  Petition for Termination, 6/30/21, at 2-3; Notes of Testimony (N.T.), 1/20/22, at 66.  Hospital staff

---

[*] Former Justice specially assigned to the Superior Court.

[1] Child's biological father is deceased.

reported that Mother exhibited resistance to their attempts to guide her with Child's care and Mother would not wake up to change or feed Child. Petition for Termination, 6/30/21, at 2-3. CYS was informed that Mother has cerebral palsy, but Mother insisted she does not need medical care. *Id.*

Child was placed in CYS's care through an emergency shelter care order several days after her birth. On August 27, 2019, the Orphans' Court held an adjudicatory and dispositional hearing at which Mother was ordered to submit to parenting classes and undergo a mental health examination.

Thereafter, CYS referred the case to the Family Service Association of Northeastern Pennsylvania, which performed an assessment of Mother's ability to parent Child. Mother was given a case plan in the intensive family reunification services program with four specific goals: (1) to understand Child's basic safety needs and care, (2) to emphasize Mother's ability to bond with Child, (3) to understand the importance of the overall health and mental health of both Mother and Child, and (4) to establish age appropriate expectations for Child. N.T., 1/20/22, at 9-10.

Mother had weekly supervised visits at the agency from September 2019 through March 2020. When the COVID pandemic began in March 2020, in-person visits were suspended and Mother was only permitted video/phone visits. After Mother had spent a year in the intensive family reunification services program, her case was closed due to her lack of progress on her goals and her inability to progress further. *Id*. at 11, 21. Mother also exhibited

significant safety concerns at the time of closure such that caseworkers felt it would not be safe to leave Child in Mother's care. *Id*. at 11.

As Child grew, medical professionals discovered that Child has genetic chromosomal abnormalities and noted Child exhibited developmental delay. Child was scheduled for weekly physical therapy, occupational therapy, and speech therapy as well as visits with a genetic specialist. *Id*. at 67-69.

In April 2021, Mother submitted to a second assessment by the Family Service Association to assist in the reunification of Mother with Child, given that she now had the support of her paramour, J.A. Thereafter, Mother and J.A. were given a family service plan with the following goals: (1) to obtain a better understanding of their parenting skills, (2) to recognize Child's developmental delays, (3) to appreciate Child's need for care and the efforts it would take to parent a child with delay and mobility issues, and (4) to obtain and maintain appropriate housing as well as gain self-sufficiency. *Id*. at 28.

Approximately twenty-two months after Child's birth, CYS reported that Mother exhibited minimal progress on her latest family service plan. On June 14, 2021, CYS filed a petition to terminate Mother's parental rights to Child.[2] The Orphans' Court held hearings on January 20, 2022 and January 26, 2022. CYS offered the testimony of Marisue Sack (case manager for the Intensive Family Reunification Services program at Family Services Association), Rebecca Ciliberto (case manager for the Intensive Family Reunification

---

[2] CYS filed an amended termination petition on June 30, 2021.

- 3 -

Services program at Family Services Association), Jessica Sprow (support worker and social service aide at CYS), and Megan Donovan (caseworker at CYS). Mother testified on her own behalf and called J.A. to testify as well.

By decree entered January 28, 2022, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5), (8) and (b). Thereafter, on February 22, 2022, Mother, through counsel, filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred in terminating parental rights and/or abused its discretion with respect to Title 23 Pa. Section 2511(a) of the Adoption Act?

2. Whether the trial court erred in terminating parental rights and/or abused its discretion with respect to Title 23 Pa. Section 2511(b) of the Adoption Act?

Mother's Brief, at 3 (suggested answers omitted).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties

- 4 -

spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re*

***C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of***

***Adoption of Charles E.D.M., II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the Orphans' Court found sufficient grounds to

terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5) and

(8), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(5),(8).  We need only agree with the trial court as to

any one subsection of Section 2511(a), in addition to Section 2511(b), to

affirm an order terminating parental rights.  ***In re D.L.B.***, 166 A.3d 322, 327

(Pa.Super. 2017) (citing ***In re M.M.***, 106 A.3d 114, 117 (Pa.Super. 2014)).

In the instant case, we will analyze the Orphans' Court's decision to terminate Mother's parental rights under Section 2511(a)(8) and (b). Mother argues the Orphans' Court abused its discretion in finding sufficient grounds for termination under Section 2511(a)(8), asserting that she has never been given the opportunity to have unsupervised visits with Child to show she could independently parent Child. Mother argues that the Orphans' Court erred in finding that she did not remedy the circumstances that led to Child's placement and alleges that the Orphans' Court based its termination order simply on the fact that hospital staff reported she had difficulty caring for Child when she was first born. Mother points out that she participated in parenting classes and visited Child consistently, but yet, agency caseworkers deemed her progress to be unsatisfactory.

In order to terminate parental rights under Section 2511(a)(8), an agency must prove by clear and convincing evidence that "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re C.L.G.*, 956 A.2d 999, 1005 (Pa.Super. 2008) (en banc) (quoting *In re Adoption of R.J.S.,* 901 A.2d 502, 511 (Pa.Super. 2006)).

First, Section 2511(a)(8) requires that Child have been removed the parent's care for at least twelve months. In this case, Child has been out of Mother's custody nearly her entire life as she was placed in emergency shelter

care just days after her birth in August 2019. When CYS filed its termination petition in June 2021, Child had been in CYS custody for approximately twenty-two months.

Second, we agree with the Orphans' Court's assessment that the conditions that led to Child's removal from Mother's care continue to exist despite Mother's claims that she made efforts to comply with her court-ordered service plan and made significant progress in her goals.

At the commencement of the termination hearings in January 2022, approximately twenty-nine months after Child was placed in CYS custody, Mother had not successfully completed a parenting program. Marysue Sack, case manager for the Intensive Family Reunification Services program, worked with Mother at her in-person visits from September 2019 to March 2020. Ms. Sack reported that at the end of the first parenting program, Mother was still unable to change Child's diaper by herself, could not walk across the room while holding Child, and could not pick Child up without assistance. N.T., 1/20/22, at 10-11.

In addition, Mother consistently needed help to feed Child in learning how to hold her and position the bottle correctly. *Id*. at 16. There was always an aide to help Mother care for Child and Mother was not left to care for Child independently. *Id*.

While Child's maternal grandmother informed CYS that Mother had cerebral palsy, Mother denies having cerebral palsy but simply believes she has balance issues. *Id*. at 18. Ms. Sack also reported that Mother exhibited

- 8 -

cognitive limitations, as on more than one occasion, Mother did not know how old Child was. *Id*. at 20. In August 2020, Mother stated that Child was turning eight years old when it was actually her first birthday. *Id*. Mother's case was closed for her failure to make progress on her goals as well as the continued concern for the safety of Child. *Id*. at 11.

Rebecca Ciliberto, caseworker for the Intensive Family Reunification Services program, testified that Mother was given a second opportunity to participate in this program as Mother now had the support of her paramour, J.A. At this point, Child's developmental delays were more pronounced with her gross and fine motor skills as well as her speech. Child required weekly physical therapy, occupational therapy, and speech therapy, such that Ms. Ciliberto testified that it would be a "full-time job" to care for Child's needs. *Id*. at 29-30, 33.

Ms. Ciliberto shared that both Mother and J.A. minimized Child's significant developmental delay and her need to be seen at multiple medical appointments. *Id*. at 33. Ms. Ciliberto was not confident that Mother fully understood the information given to her by health care providers. *Id*.

In observing Mother's visits with Child, Ms. Ciliberto noted that Mother had to be constantly reminded on how to care for Child. Mother still needed assistance in changing Child's diaper and clothes, required direction on how to carry Child with proper support, and required help to put Child in a tub or a crib. *Id*. at 31-33. Ms. Ciliberto had to remind Mother to be cognizant of Child's safety in leaving Child on a chair where she could slide off, in making

sure Child was sitting up straight while eating to avoid a choking hazard, and to not leave Child unattended on the changing table. *Id*. at 31-32, 34-35.

In addition, Ms. Ciliberto was concerned as Mother did not appreciate "feedback" to help her care for Child and that Mother would insist that she would do it herself even when she required prompting to do basic tasks. *Id*. at 29. Ms. Ciliberto feared that Mother would not utilize her available resources and ask for assistance, even from J.A., if she was struggling to care for Child. *Id*. at 34.

CYS caseworkers Jessica Sprow and Megan Donovan offered consistent testimony in which they agreed that from September 2019 to the date of the termination hearing, Mother struggled with simple tasks necessary to care for Child and had to be constantly reminded on how to keep Child safe. *Id*. at 56-57.

Ms. Sprow also testified that when Child was an infant, Mother would sit on the couch and hold her with little interaction. *Id*. As Child grew, Mother would not interact with Child on the floor and give her the attention she needed. *Id*. at 57-58. Ms. Sprow shared that Mother constantly needed prompting to play with and talk to Child. *Id*. Mother refused to follow caseworkers' advice on how to interact with Child. *Id*.

Ms. Donovan testified that while the agency had hoped that it would become easier for Mother to adequately parent Child when Child grew older and more independent, the agency discovered it was the quite the opposite circumstances. *Id*. at 74. At the time of the termination hearing, Child was

twenty-nine months old and was still unable to crawl, walk, or talk. N.T., 1/26/22, at 19-20. As the Child grew older, it became even more difficult for Mother to hold Child, as Child was very heavy and did not have control over her own body. N.T., 1/20/22, at 74.

Although the agency also hoped that J.A. could assist Mother with her parenting of Child, the couple's relationship did not prove to be the support system Mother needed. Ms. Ciliberto testified that it would be a drastic change for Mother and J.A. to care for Child on their own. Ms. Donovan noted that J.A., who is sixty-one years old and not "the healthiest person," was easily fatigued. *Id*. at 75-76. Given the amount of care Child needs, Ms. Donovan does not believe that J.A. would be able to provide care for Child on a long-term basis. *Id*. at 76.

Ms. Donovan emphasized that Mother and J.A. do not grasp the seriousness of Child's medical issues even though health care providers have indicated that there is a possibility that Child may never walk or never speak. *Id*. at 72-73. Mother and J.A. believe that Child will speak and walk whenever she is ready. *Id*. at 72. Even though Child could not walk at twenty-nine months of age, J.A. testified that he was "not sure" that Child had developmental delay. N.T., 1/26/22, at 28.

While Child could potentially achieve these skills, Ms. Donovan also believes that Mother and J.A. do not appreciate the necessity of planning for how they would provide care in the future for a child with disabilities. N.T., 1/20/22, at 73. In addition, Ms. Donovan feared that Mother would not take

Child to weekly therapy appointments as she believes Child does not need it or that the appointments are too far away. *Id*. at 91.

Further, Mother had failed to obtain appropriate housing where she could properly care for Child. Ms. Ciliberto testified that despite being ordered to obtain appropriate housing, Mother did not make any accommodations in her home for Child or have any appropriate supplies to care for Child in her home. *Id*. at 36. Mother and J.A. have separate one-bedroom apartments, but indicated that they stopped looking for a bigger apartment as they do not want to take on a financial burden if Child would not be returned to their care. *Id*. at 77. Both Mother and J.A. are unemployed, but they receive assistance from Social Security. N.T., 1/26/22, at 12-13, 28.

Despite Mother's protests that she was never given the opportunity to parent Child on her own, the record shows Mother had not progressed beyond supervised visits of Child at any point during the case due to the shared concern of multiple caseworkers involved who believed Child was not safe in Mother's care. After observing Mother in separate parenting programs, both Ms. Sack and Ms. Ciliberto testified independently that they believed Mother lacked the ability to understand Child's significant needs and did not provide a safe environment for Child. N.T. 1/20/22, at 24-25, 33, 44. Caseworkers Ms. Sprow and Ms. Donovan agreed that Child would not be safe in Mother's care as Mother lacks the ability to meet Child's needs. *Id*. at 58-59, 73.

While Mother did make efforts to comply with parenting goals in the family reunification program, she unfortunately has not been able to

consistently prove that, after Child's more than 29-month placement, she can adequately care for Child and provide Child with a stable, suitable, and permanent home environment.

As Section 2511(a)(8) allows for the termination of parental rights when the conditions that led to a child's removal continue to exist after one year,

> the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

***Matter of Adoption of M.A.B.***, 166 A.3d 434, 447 (Pa.Super. 2017) (citation omitted) (emphasis in original).

Although Mother claims alleges that she would be able to care for Child if she was given periods of unsupervised contact, the Orphans' Court was entitled to weigh the evidence, assess credibility, and ultimately accept the testimony of the agency caseworkers who all asserted that it was unsafe to place Child with Mother without proper supervision. Accordingly, we see no error in the Orphans' Court's conclusion that the conditions that led to Child's placement continue to exist.

Third, Section 2511(a)(8) also expressly requires an evaluation of whether "termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(8). This Court has held that the "needs and welfare" analysis is "distinct" from the analysis required under

- 13 -

Section 2511(b), such that courts are "required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' of [the child] as proscribed by Section 2511(b)." *In re C.L.G.*, *supra*. However, Mother only argues that CYS failed to prove termination would best serve Child's needs and welfare under section (b). We thus limit our analysis accordingly.

As noted above, after having determined that the statutory grounds for termination have been met pursuant to Section 2511(a), we now must consider whether the Orphans' Court properly found that termination serves the best interests of Child as set forth in Section 2511(b). Mother claims that the termination would be harmful to Child's developmental, physical, and emotional needs and welfare. Mother asserts that it would be to Child's detriment to break the bond Child has with Mother.

As to Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.* [*a/k/a E.W.C. & L.M. a/k/a L.C., Jr.*], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

Nevertheless, "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re N.A.M*., 33 A.3d 95, 103 (Pa.Super. 2011) (citing *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008)).  In undertaking this analysis,

> "[courts] must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. *See In re A.R.M.F.,* 837 A.2d 1231 (Pa.Super. 2003) (holding court properly terminated parental rights where decision was based in part on social worker's and caseworker's testimony that children did not share significant bond with biological parents and were well bonded with their foster parents).  Additionally, Section 2511(b) does not require a formal bonding evaluation. *In re K.K.R.-S.,* [958 A.2d 529, 533 (Pa.Super. 2008)].

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010).

As noted above, Child has been out of Mother's care for the majority of her life as she was placed in CYS custody shortly after her birth.  As discussed in detail above, there are major concerns with Mother's ability to provide for Child's developmental and physical needs.

With respect to Child's emotional needs, Child recognizes Mother as a familiar face as Mother did consistently exercise visitation with Child.[3]  Child

---

[3] We note the trial court did not set forth a detailed analysis as to whether CYS met its burden under Section 2511(b). Although the trial judge did not expressly indicate that it had considered the bond between Child and Mother, there is support in the record from the caseworkers' testimony that it would not be detrimental to Child to break any bond she has with Mother in light of her limited contact with Mother and her young age.  In the interest of judicial efficiency, we will not remand and instead address the issue.

does not cry anymore when she has to leave Foster Mother during the visits with Mother. N.T., 1/26/22, at 35. Ms. Donovan testified that while there is a bond between Mother and Child and that Mother's love for Child is evident, their relationship does not appear to be that of parent and a child, where the child has an emotional tie to the parent. *Id*. at 35, 37. Ms. Donovan cited Mother's lack of meaningful interaction with Child during their visitation periods. *Id*. at 35.

In contrast, the Orphans' Court found that Foster Parents have provided for Child's physical, developmental, and emotional needs and that she has thrived in their care. Child has been assimilated into Foster Parents' family where she is the only child. *Id*. at 32-33. Ms. Donovan shared that Foster Parents are "strong advocates" for Child's medical needs and Foster Mother dedicates her time to attending Child's multiple weekly appointments. N.T. 1/20/22, at 73. Foster Parents promote Child's developmental needs in providing educational toys and in incorporating what she learns during therapy at home. N.T., 1/26/22, at 33-34.

Foster Parents have provided for Child's emotional needs, as Child reaches out to Foster Parents when she is upset and they offer her comfort. *Id*. at 34. Ms. Donovan reported that Child has a "strong bond" with Foster Parents and she "lights up" and is "excited" whenever they come into the room and acts like "she won the lottery." *Id*. at 37.

Ms. Donovan opined that there would not be any adverse affect on Child if Mother's parental rights were terminated, but rather a positive effect as

Foster Parents are dedicated to Child's special needs and will be able to provide for her in the future, no matter her medical prognosis. *Id*. at 37-38.

Foster Parents wish to adopt Child, understand that they will be obligated to meet Child's financial needs, and recognize that Child would inherit from their family as if she were their natural born child. *Id*. at 38.

In addition, Ms. Donovan testified that Foster Parents have a good relationship with Mother and keep in communication with her by sending updates, photos, and videos. *Id*. at 46. Foster Parents are willing to have continuing contact with Mother in allowing her to visit Child if they were permitted to adopt Child. *Id*. Foster Parents recognize the importance of Mother being a part of Child's life. *Id*. at 46-47.

Thus, the record supports the Orphans' Court's finding that Child's developmental, physical and emotional needs and welfare favor termination of parental rights pursuant to Section 2511(b). *See T.S.M.*, 620 Pa. at 628, 71 A.3d at 267.

While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Child is entitled to permanency and stability; a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in

a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the Orphans' Court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(8) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/04/2022

- 18 -